# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : |
| | : Criminal No. 22-45-CFC |
| JAVIER RODRIGUEZ, | : |
| | : |
| Defendant. | : |

## GOVERNMENT'S SENTENCING MEMORANDUM

"I gotta eliminate this bitch, dog. She gotta fucking go." These were not the mere musings of a scorned ex-husband. They were clear statements of intent by a man who was so serious about killing his ex-wife that he paid $5,000 up front for her murder, with the promise of another $5,000 to follow once she was dead. The Defendant even threatened the hitman he had hired to complete the murder. As a result of this abhorrent conduct, the government recommends a sentence of 120 months, the statutory maximum sentence permitted by Congress and a guideline sentence. This recommended sentence properly reflects the

1

incredibly serious nature of the instant of the offense as well as the Defendant's personal history and characteristics.[1]  18 U.S.C. § 3553(a).

## I. Factual and Procedural Background

In February 2022, the Defendant solicited a confidential source ("CS") to kill his ex-wife.  Third Revised Presentence Investigation Report dated December 21, 2023 ("PSR") ¶ 13.  On February 5, 2022, the Defendant took the CS into Maryland to show the CS exactly where his ex-wife lived and worked.  PSR ¶ 14.  Unbeknownst to the Defendant, the CS then approached the FBI about the Defendant's plans to engage in murder-for-hire.  PSR ¶ 15.

The FBI began audio and video recording the CS's communications with the Defendant.  On February 15, 2022 the Defendant met with the CS to further discuss the potential murder.  PSR ¶ 16.  After the CS expressed some skepticism in the job, the Defendant asked the CS if he was "chickening out."  PSR ¶ 18.  The CS responded that murdering his ex-wife was "extremist."  *Id*.  The Defendant responded "Not really. You're just popping a bitch."  *Id*.  The Defendant then remarked that he

---

[1] As it does in every case, the government will be filing a sealed Attachment A to this Sentencing Memorandum.

2

would have done it but for needing an alibi on the day of the murder. *Id*. At this meeting, the Defendant explained to the CS exactly how the murder should be carried out—notably at the victim's house on a Saturday to make it look like a drug deal gone bad. PSR ¶ 17. The CS said he would consult some associates to determine if they would do the job. PSR ¶ 19.

At a February 17 follow-up meeting two days later, the CS confirmed that a criminal associate was willing to do the murder for $10,000 and wanted $5,000 up front. The Defendant then explained that he actually wanted the victim killed at her job, the tire shop in Maryland that the Defendant had taken the CS on February 5 to stalk. PSR ¶ 20. The Defendant described that he wanted the murder to look like a robbery and because there was so much noise that at the tire shop anyway, the assassins could just gun the victim down and leave without any issues. PSR ¶ 20. When the CS inquired about the potential for other witnesses, the Defendant explained that the victim's co-worker could just be killed as well and admonished him about the importance of *actually* killing his ex-wife, not just injuring her:

> There will be a little Salvadoran guy in there. There's a little Salvadoran guy in there that's 4

3

> foot tall. And that guy ain't gonna say a fucking thing because he don't have papers. If that mother fucker get in the way "can" too. Fuck it, "can" that mother fucker, put his dick in the dirt.
>
> […]
>
> They got to make sure that that shit is done, they got to make sure that she is done, you know what I am saying? Because, she's done, done. They got to make sure she is done. Not go over there and start busting caps, and missing and she just get a fucking scratch and she just go to the hospital and she is all good, then she will be on high alert. They got to make sure that this bitch "bang bang," that this bitch is done.

PSR ¶ 22; *see also* D.I. 2 at ¶ 13. The meeting ended with the Defendant confirming the deal but explaining that it would take some time for him to collect the $5,000 up front payment.

The Defendant approached the CS in mid-March at work and said he was ready for the murder to take place and had the money ready. PSR ¶ 25. Because the CS was not in a position to record the interaction, the CS put off discussing details. *Id.* Later, in a recorded phone conversation on March 17, the CS said that he could collect the down payment the next day. PSR ¶ 25. When the Defendant inquired about timing, the CS responded that the deal would happen "within a week." *Id.* Concerned about timing and the potential that he could get "burned" out of $5,000,

4

the Defendant implied a threat to the CS, stating he had some "peoples down state" that he could harm the CS if the plan was not followed through. *Id*. The CS then agreed to meet the next day, March 18. *Id*.

During the recorded March 18 meeting in the CS's car, the Defendant counted out $5,000 and handed it to the CS. During the conversation, the Defendant confirmed that the plan was "a go" stating that "I gotta eliminate this bitch, dog. She gotta fucking go." The Defendant gave the CS tips to pass along to the shooter about arriving before the tire shop opened. PSR ¶ 29. The Defendant further explained that there would be one to three other people at the tire shop at the time of planned murder, but that the shooter could "blow them all the fuck up" because "[s]he needs to get done." *Id*.

On March 23, the FBI planned a ruse to make the Defendant believe that his ex-wife had been killed. Posing as state detectives, an FBI Special Agent and a task force officer called the Defendant and asked him to meet at Delaware State Police Troop 2, informing him that his ex-wife was missing. PSR ¶ 31. In an interview room, Defendant was then told that his ex-wife's car was found running with blood inside it. PSR ¶ 32. He feigned extreme sadness at the news, including yelling, shoving

5

a chair, and crying. PSR ¶ 33. Knowing that as her ex-husband, he was at least a person of interest in any wrongdoing, the Defendant began to explain that the victim was on drugs and the Defendant had to get a no-contact order against her. PSR ¶ 34. After the Defendant was confronted with the murder-for-hire plot, he admitted to providing $5,000 to someone, but claimed that he thought the money was just going to be stolen. PSR ¶ 38. He eventually admitted to being ashamed before saying he did not want to talk anymore. *Id.* At that point, the Defendant was formally arrested and notified of the charges. *Id.*

The Defendant made his initial appearance later that day on a criminal complaint charging the murder-for-hire scheme. PSR ¶¶ 1-2. On June 27, 2022, the Defendant pled guilty to an Information charging him with interstate murder-for-hire in violation of 18 U.S.C. § 1958. PSR ¶ 4. Because nobody was harmed in the murder-for-hire plot, the statutory maximum sentence is 10 years. PSR ¶ 116; *see also* 18 U.S.C. § 1958(a). Due to the statutory maximum, the current applicable sentencing guidelines range is lowered from 151 to 188 months to 120 months. PSR ¶ 117.

## II. Guidelines Objection

The Defendant has argued that he is entitled to the benefit of sentencing guidelines Amendment 821, found at U.S.S.G. § 4C1.1. In support, he argues that the disqualifying condition found at §4C1.1(a)(3), which requires that the Defendant "did not use violence or credible threats of violence in connection with the offense" does not apply. It does.[2]

The Sentencing Commission's language in 4C1.1(a)(3) is not new—it was imported from existing provisions, directly matching the language found at 18 U.S.C. § 3553(f)(2), U.S.S.G. § 5C1.2(a)(2), and closely tracking the language of U.S.S.G. § 2D1.1(b)(2). Case law interpreting those provisions has interpreted that language expansively, embracing intentionally engaging in inherently violent acts and threats communicated to third parties. The Defendant's conduct falls within this provision.

First, hiring someone to commit murder on one's behalf is a quintessential use of violence. One pays an assassin to commit a crime

---

[2] The government also incorporates by reference its response to the United States Probation Office in connection with this objection. PSR at p. 25.

7

of violence. The Third Circuit has required only an examination of the nature of the act itself to determine if it was violent. As an example, in *United States v. Williams*, the Third Circuit concluded the defendant's arson (despite burning down his own vacant building for insurance proceeds) was "an inherently violent act." 299 F.3d 250, 258-59 (3d Cir. 2002). In another case, the Third Circuit found that a defendant "used violence" where he tried to flee by ramming his car into an occupied police car, which "deliberately risked serious bodily injury." *United States v. Acevedo-Bruce*, 209 F.Appx. 197, 200 (3d Cir. 2006) (unpublished).

Second, the Defendant's conduct also qualifies as a threat of violence. Contrary to the Defendant's argument, there has never been a requirement that a "threat" be communicated directly to a victim to qualify as a "threat." *See, e.g., United States v. Parr*, 545 F.3d 491, 498 (7th Cir. 2008). Having established that a threat existed,[3] the Defendant "used [them] . . . in connection with the offense." Indeed, the Defendant's threats of violence were clearly in connection with the offense, because,

---

[3] The Defendant states "at issue is not whether there was a threat of violence, but whether Mr. Rodriguez 'use[d]' a threat of violence in the commission of the offense." The government notes that the requirement is that the threat be used "in *connection* with the offense." U.S.S.G. § 4C1.1(a)(3) (emphasis added).

as described above, he explicitly instructed a hired hitman how to murder his ex-wife. And the Defendant's threats were certainly credible—his entire objective was to cause her death and took numerous affirmative steps (like hiring and paying a hitman) to accomplish it. Other courts have found similar conduct constituted credible threats of violence. For example, in *United States v. White*, 621 F.Appx. 889, 893 (9th Cir. 2015), the Ninth Circuit affirmed a district court's finding of credible threats of violence where the defendant made "several statements at a . . . gang meeting in which he urged younger gang members to use violence." Similarly, in *United States v. McFadden*, the district court found a "credible threat of violence" under U.S.S.G. § 2D1.1(b)(2) where the defendant told a third party he wanted to put his victim "in a car, beat him, dress him in a wig and lipstick, and force him to walk home naked on a major vehicle thoroughfare." No. 15-376, 2018 WL 8950924 at *4 (E.D. Pa. October 26, 2018).

    For each of the foregoing reasons, the Defendant both used violence and threats of violence in connection with the offense.

### III. Sentencing Recommendation

The government submits that a sentence of 120 months, the applicable guidelines sentence and the statutory maximum is the appropriate sentence here. This recommendation reflects the seriousness of the instant offense as well as the Defendant's personal history and characteristics. 18 U.S.C. § 3553(a).

1. <u>The seriousness of the offense supports the government's recommended sentence</u>.

The Defendant's plot to murder his ex-wife deserves the maximum sentence authorized by Congress. Not only did the Defendant solicit the killing of his ex-wife—he planned, coordinated, and directed every facet of the crime in gruesome detail. As he said in his own words, he would have been more than willing to do the deed himself; the only thing that drove the Defendant to enlist a co-conspirator was his desire for an alibi.

Over the course of several recorded conversations, the Defendant made it abundantly clear that he wanted his ex-wife gunned down, first at her home before changing his mind and instructing the hitman to do it at her work. To show how serious he was about killing his ex-wife, he took the CS into Maryland to show him both her home and her job. He also showed the CS her social media profile. D.I. 2., ¶ 9.

As the conversations with the CS makes clear, the Defendant was hell bent on "eliminat[ing]" his wife. When the CS expressed concerns about doing the deed, he accused him of "chickening out," and then later made implied threats about what would happen to the CS if his ex-wife was not actually murdered. The Defendant even planned out what would happen when the murder occurred at his ex-wife's work, explaining that her co-worker would be present and that the hitman should just murder him too. Finally, when he voluntarily appeared for an interview at the Delaware State Police troop, he feigned shock and sadness before providing law enforcement with a fake pre-packaged story about ex-wife's drug use and acted as if he had been the victim of her aggression.

This conduct evidences just how serious the Defendant was about accomplishing this murder. His callous disregard for others, even those unconnected to his issues with his ex-wife, demonstrate the levels of depravity to which he was willing to go to ensure the task was completed. And his desire for an alibi and his pre-planned police story show that this offense was as premeditated as it gets and involved absolutely no remorse on the Defendant's part.

The *only* thing that stopped this murder from actually occurring was something that the Defendant could not control—the person he recruited for the act decided to report him to the FBI. Had this offense resulted in the injury or death of another—again, things that the Defendant desperately wanted to happen—he would be facing much more significant consequences than the 10-year statutory maximum here. *See* 18 U.S.C. § 1958(a). As a result, the Defendant does not deserve any additional leniency that the object of his plan luckily did not come to pass since he played no part in that outcome.

2. The government's recommended sentence properly takes into account Defendant's personal history and characteristics.

The Defendant's personal history and characteristics further suggest that the government's recommended sentence is appropriate. While there are certainly some positive aspects about the Defendant's background, a full and fair review of his personal history suggests that his actions here are not anomalous and that the guidelines sentence the government seeks is warranted.

First, the Defendant is a registered sex offender due to the sexual assault of a 15 year old girl when he was 27 years old. PSR ¶¶ 60, 61. The police were specifically alerted to this incident because the

12

Defendant was threatening the girl he assaulted as well as her boyfriend. *Id*. The police report from that offense even mentions that the Defendant had a "history of stalking girls when the relationship goes bad." PSR ¶ 62. In addition to this conviction, the Defendant has another conviction for burglarizing a home, specifically conspiring with others to break into a home to steal firearms. PSR ¶ 57. The Defendant spent six months in prison for each of those prior offenses. Just as troubling with regard to this instant case is that there have been prior allegations of violence perpetrated by the Defendant against an ex-wife. In 2005, the Defendant was charged with assault, arson, and malicious burning for shooting a flaming arrow at her home. PSR ¶ 72. The charges were ultimately indefinitely postponed and appear to have remained that way. PSR ¶ 72; *see also* Md. Rule 4-248.

  The Defendant has submitted a psychological report that seems to indicate that the offense conduct here was: "quite anomalous for Mr. Rodriguez. There is nothing in Mr. Rodriguez's history that suggests that he is a violent individual. He provided multiple letters of reference from family and friends who attested to his character." Def. Sen. Mem. Ex. B at p. 12. The government disagrees. The report nowhere references that

13

the Defendant is a registered sex offender and seems to indicate he has no prior criminal history. Despite scores on the objective test administered by Dr. Cooney-Koss indicating that that the Defendant "tended to err on the side of minimizing minor faults and shortcomings," having an issue with "significant persecutory ideation, such as believing that others seek to harm him," and being "hostile toward others at times, self-focused, and lack[ing] empathy," Dr. Cooney-Koss nevertheless reaffirmed that the test results were valid based on the subjective beliefs of the Defendant's friends and family members. Def. Sen. Mem. Ex. B at 10-12. However, objective data points, like the Defendant's criminal history, point the opposite direction. While it is commendable that the Defendant treats the people that he is closest to with kindness and care, there is enough evidence to show that he treats those that he doesn't like with malice and aggression.

Second, the Defendant's personal life also points in two different directions. While it is certainly a positive attribute of his character that the Defendant has a long history of employment, a closer look details some issues. He was fired from a trucking job in October 2018. PSR ¶ 111. He appears to have been unemployed until he obtained a new

14

trucking job in July 2019. PSR ¶¶ 109-111  He held down that job for two years, working there from July 2019 through August 2021. However, that employer reported it would not rehire the Defendant because he could "not get along with other employees, bad mouthed the company and every previous company he worked for." PSR ¶ 109. There is no employment history from August 2021 through December 2021, but indications are that the Defendant may have had a short-lived employment stint with another company. PSR ¶ 109. Ultimately, Defendant worked at his newest job for only a couple of months before approaching the CS about killing his wife. These data points indicate that even gainful employment could not keep the Defendant from committing crime and that the Defendant has a history of moving from job to job without meaningfully advancing. The one exception is an employer who is unwilling to rehire him.

Taken together, the Defendant's personal history and characteristics suggest that the Defendant is at risk of recidivating. While the government agrees that long-term counseling and medication may help assuage concerns of further criminality, at some point after his period of incarceration and supervised release, the Defendant will need

to be trusted to continue with treatment on his own accord and utilize coping skills to deal with negative developments in his life. His record heretofore is mixed as to how successful those endeavors might be.

3. <u>A guidelines sentence will not create unwarranted sentencing disparities</u>.

It goes without saying that a sentence within the applicable sentencing guidelines range—a range created for the purpose of uniformity—will rarely, if ever, create an unwarranted sentencing disparity. *See* 18 U.S.C. § 3553(a)(6) (requiring the disparity to be among "defendants with similar records who have been found guilty of similar conduct").

Nevertheless, the Defendant argues that the approximately 35% downward variance from the adjusted sentencing guidelines range and nearly 50% downward variance from the original sentencing guidelines range as calculated (but for the statutory maximum) he seeks will not create unwarranted sentencing disparities. The Defendant submits that there have been 87 cases since 2013 that resulted in a sentence of 96 months or fewer. Def. Sen. Mem. p. 8. It is difficult to ascertain the efficacy of this information without knowing how many total cases there were over the same time period, how many of the sentences were

16

downward variances, and how many were downward variances over the government's objection.

The government's research has found that within the last five years (since 2018), there have been 141 cases wherein the same sentencing guideline provision applicable here was used, U.S.S.G. § 2A1.5 (Conspiracy or Solicitation to Commit Murder).[4]  Only 40 of those sentences (28%) resulted in a downward variance of any sort without a motion for downward variance from the government.

And there are reasons to believe that this case is on the more egregious end of those utilizing the solicitation and conspiracy to commit murder guideline.  As explained above, the Defendant did much more than solicit murder—he recruited, planned, directed, and even threatened his way to demand that it occur.  The government submits that a sentence at the adjusted sentencing guidelines range—120 months—is already too lenient and a windfall for the Defendant because of the statutory maximum set by Congress.

---

[4] Using the United States Sentencing Commission's Interactive Data Analyzer sorted by "Guideline Application" and "Sentences Relative to Guideline Range" based on U.S.S.G. § 2A1.5 as primary guideline. *Available at*: https://ida.ussc.gov/analytics/saw.dll?Dashboard.

## IV. Conclusion

For the aforementioned reasons, the government recommends a term of 120 months of imprisonment, which represents a sentence at the statutory maximum and applicable guidelines range.

                              Respectfully submitted,

                              DAVID C. WEISS
                              United States Attorney

                        By: */s/ Alexander P. Ibrahim*
                              Alexander P. Ibrahim
                              Assistant United States Attorney

Dated: December 29, 2023